# S. W. ROSE AND OTHERS v. KENNESETH ISRAEL CONGREGATION.[1]

April 8, 1949.

No. 34,820.

---

[1]Reported in 36 N. W. (2d) 791.

*Brill, Grossman & Brill,* for appellant.
*H. Z. Mendow,* for respondents.

FRANK T. GALLAGHER, JUSTICE.

Appeal from a judgment of the district court.

Homewood Addition is a district in north Minneapolis bounded by Xerxes, Plymouth, Penn, and Oak Park avenues. It is comprised of about 400 platted lots and an unplatted park which covers approximately one square block. The district was platted and registered under the Torrens title system by the Security Land and Investment Company and George N. Farwell in 1915 or 1916. The deeds to many of the lots sold by the common grantor contained a clause which, among other things, restricted the use of the lot described in each deed to a single residence, although the plat or registration on file showed no such restrictive limitations.

On or about November 5, 1941, defendant, Kenneseth Israel Congregation, purchased lots 4, 5, and 6 in block 4, Homewood Addition, from Susan Farwell Bennett and her husband. The deed to these lots contained the following restrictions:

"This conveyance is made upon the following conditions only: That when the premises herein conveyed are improved it shall be by the erection of a new building to be used exclusively for religious purposes or by the erection of not more than three residential buildings costing not less than $3,500.00 each [omitting matters pertaining to frontage, building line, etc.]."

Defendant planned on erecting a synagogue on these three lots. A dedication ceremony was conducted in October 1946, and a sign

evidencing defendant's intention was placed upon the lots at that time. The work of construction was started in the spring of 1947. This action for permanently restraining defendant from erecting the synagogue was commenced in May 1947. In June of that year, the trial court granted a temporary injunction upon condition that plaintiffs file a bond of $5,000 on or before July 15, 1947. When this condition precedent to the issuance of the injunction was not fulfilled, defendant continued with some preliminary construction work.

The action for the permanent injunction was tried by the court without a jury. The court found that the original owners of the land platted as Homewood Addition developed it and sold lots in it according to a uniform general plan; that it was to be a district of one-family residences; that as lots were sold restrictive covenants were put in the deeds by the grantors pursuant to such general plan for the benefit of both grantors and grantees; that the deed to the lots purchased by defendant contained restricted covenants that when the premises were improved it should be by the erection of a new building to be used exclusively for religious purposes or by the erection of not more than three residential buildings costing not less than $3,500 each; that each of plaintiffs owned a tract of land in Homewood Addition, the deeds to which contained restrictive covenants conforming to the general plan; that they and many other purchasers or owners of lots in Homewood improved their tracts with residences conforming to the general plan; that Homewood is a residential section developed under such general plan; that the structure which defendant intends to put on the lots and the use it intends to make of them would be a departure from the general plan for the development of the addition as a residential district; that defendant had notice at the time it purchased the lots that Homewood was restricted to that of a residential district under a general plan for development, which general plan has never been abandoned; and that the lots owned by defendant are not exempted from the general plan for development. In its conclusions of law, the court determined that plaintiffs were entitled to a decree en-

joining defendant from erecting a building on its lots to be used for religious purposes, and it ordered judgment accordingly.

Plaintiffs contend in their brief that there is ample evidence to sustain the judgment of the trial court; that the abolition of implied covenants does not affect the equity of owners receiving deeds with restrictions or owners having built up a neighborhood in accordance with a common plan; that the character of the neighborhood and the houses built in conformity with restrictions are sufficient notice of the existence of the restrictions; that the sale of lots with restrictions in them in and of itself creates a general plan; that the Torrens act does not give immunity from actual notice; and that there has been no laches.

Defendant argues that there was no proof of any plan or agreement on the part of the original owners of Homewood to limit the use of the addition to residential property or to exclude a synagogue from the area; that no one testified that there was such a plan or produced any literature, advertisements, or representations by witnesses of such a plan; that even assuming, for the sake of argument, that there was such a plan, defendant was not bound thereby; and that plaintiffs are guilty of laches.

Prior to the trial and on June 27, 1947, the attorneys for the contesting parties addressed a letter to the trial judge, in the nature of a stipulation and made a part of the record, as to the status of the property on that date. It reads as follows:

"The undersigned together personally examined Homewood Addition, the property involved in the above entitled action, this afternoon. Attached hereto is a plat of the addition initialed by both of us for identification.

"Except for the frontage on Penn Avenue between 12th Ave. No. and Plymouth and the frontage on Plymouth Ave. between Penn Ave. and Thomas and excepting for the church on the corner of Penn and Oak Park and the school house and playground in Block 9 and Farwell Park, all of the lots which have been improved are improved with single residence buildings. The lots on Penn Ave. be-

tween 12th and Plymouth Aves. are improved as follows: there is a single residence dwelling on the corner of Penn and 12th Ave.; there is an oil station on Lots 1 and 2, Block 1 at the corner of Penn and Plymouth, and all the rest of the lots are improved with duplexes, seven in number.

"Other than the lots on Plymouth Ave. between Penn and Thomas which will be next hereinafter referred to, the only vacant lots are the following: Lots 13 and 14 in Block 5; Lots 18 and 19 in Block 2; Lots 11, 12, 13, and 14 in Block 20; Lots 1, 2, 3, 4, 5, 6, 7, 8, and 9 of Block 20 are used as the front lawns of houses shown on the plat in Block 20.

"Referring now specifically to the Plymouth Ave. frontage between Penn and Thomas, all of this frontage in Homewood is vacant excepting: (1) the gas station on Lots 1 and 2, Block 1, hereinbefore referred to, (2) the doctor's office and the doctor's residence on Lots 28 and 29, Block 1, and in this connection the doctor's office has a standard with a sign on it at the front of his office facing on Plymouth at the sidewalk line, (3) the church on Lots 1 and 2, Block 2.

"It was agreed that on the opposite side of Plymouth Ave. from Homewood between Penn and approximately the center of Block 4 there is a streetcar line and a Y and that across the street from said streetcar line on the Plymouth Ave. frontage referred to there are commercial improvements exclusively except for one house, a single dwelling, and one four-family flat and that between Penn and Sheridan on Plymouth and in the following block between Sheridan and Russell on Plymouth on the North side thereof is predominantly commercially improved.

"Respectfully submitted,

"Josiah E. Brill

"H. Z. Mendow"

Testifying on behalf of plaintiffs, Paul E. Von Kuster, president of David C. Bell Investment Company, said that he was familiar to a certain extent with the platting and sale of lots in Homewood

Addition; that the lots in that addition were sold primarily through his office; that Homewood Addition was platted by his company and George N. Farwell, also an owner of the subdivision; and that the subdivision was first developed in 1915 or 1916 (later he corrected that date by affidavit to "about 1906"). When questioned upon direct examination whether the area was platted and developed as a residential district, he replied, "Well, I will qualify that by saying that a portion of that subdivision, those lots fronting on Plymouth Avenue were not considered as residential lots." He said that the area generally was developed as a residential area and that a restriction similar to the one read into the record was included in each deed "On most of the property" sold. He testified on cross-examination that the lots purchased by defendant "were Farwell's lots"; that half of the lots on the plat were sold by Farwell and the other half by the Security Land and Investment Company, owned and controlled by the Bell company, as each of the two parties owned one section of the whole land and not scattered lots. He said that during his connection with the sale of these lots he had no recollection of ever having told anybody that the lots on Plymouth avenue would be restricted to residential purposes. He testified that some of these lots were sold direct by George N. Farwell, now deceased, and that a son, Grover Farwell, and a daughter, Susan Farwell Bennett, both nonresidents for the past 25 years, inherited the property left by their father in Homewood Addition. On redirect examination, he said that Homewood Addition was developed as a residential section "with the exception of Plymouth Avenue, the Penn corner, from Penn to, I believe, it was Sheridan that we never considered." He explained that there were some restrictions in deeds along Plymouth avenue; that they deeded a couple of lots to a church between Russell and Queen avenues. He testified further as follows:

"Q. But the Philip Gordon house contained a restriction?

"A. Yes. He has an office with his residence.

"Q. And the Kaplan property in 1940 retained the restriction?

"A. Yes.

"Q. Those are Plymouth Avenue frontages from Penn to Sheridan?

"A. Yes.

"Q. Never anything from Sheridan beyond?

"A. We never thought of that.

"Q. That was still to be residential?

"A. Yes."

Upon recross-examination, the witness said that he believed Dr. Gordon had his office in his home and that a sign advertising his profession was on his house.

C. Elmer Keefe, vice president of the Bell company, testified that for about 30 years he had been connected with the company which sold lots in Homewood Addition and that each lot sold usually contained a restriction in the deed. He said that Homewood was generally developed as a restricted residential district and that it is "obvious" that it is a residential district. He thought that he had been connected with the sale of the lots involved herein to defendant and assumed that lots on Penn avenue between Plymouth and Twelfth were sold with similar restrictions. He testified upon cross-examination that in his use of the term "residential district" he did not intend to mean that the lots were sold for the purpose and manner to exclude any of them for religious purposes. He said that there are two Protestant churches in the Homewood district and that they were erected about 45 years ago. Later, by affidavit, he corrected this time by stating "that the said two Protestant churches were built in Homewood not earlier than the beginning of 1911." He also said that he knew that some lots were sold for purposes other than single-family dwellings, including duplexes, the two churches, and a filling station, and that the doctor's office had been used in that way for about eight or ten years. He said that the three lots sold to defendant were not suitable for residential purposes on account of the way they faced, and that the improvements across the street on Plymouth from Thomas to Penn avenues, gen-

erally speaking, were commercial. When asked if he ever told a prospective purchaser that any of the lots on Plymouth avenue would be restricted to residential purposes, he replied that he may have said something to that effect, because, about 10 or 15 years ago, after most of the lots had been sold, he was attempting to sell lots 1, 2, and 3, adjoining defendant's lots, for commercial purposes, and that after selling one of the lots a lawsuit was started, and "we were prohibited from selling for commercial." It appears that later those lots were lost for taxes and at the time of the trial were owned by Alfred H. Tapper.

David Kassler, called for cross-examination on behalf of plaintiffs, testified that he was president of defendant's synagogue. He was asked certain questions pertaining to a proposed merger with another synagogue. Minutes of board meetings were shown reporting that the congregation purchased the lots in question, and he said that they had an attorney's opinion to the effect that a synagogue could be constructed on the lots. Testifying on direct examination on behalf of defendant, he said that they had a dedication ceremony in October 1946, when the cornerstone or marking stones were laid; that public announcement of the ceremony appeared in the newspapers and 300 or 400 people attended, including the governor and the mayor; and that between $5,000 and $6,000 had been expended in the erection of the building, $2,000 of which was spent before the suit was started. He said that Alfred H. Tapper offered to sell his lots adjoining defendant's property to be used in connection with the synagogue, and Kassler told him that "if we bought his lot[s] we would have no trouble building our synagogue." This was denied by Tapper. The witness said that at the time they made application for a permit he heard that there were objections before the planning commission. He said on cross-examination that he knew there were restrictions in Homewood Addition at the time the lots were bought. Explaining this on redirect examination, he said that he knew there were restrictions, but did not know what they were, and that he had heard that lots on Plymouth avenue were not restricted. He further said that at the time of the trial all that was

on the site was an excavation, some framework for the foundation, a contractor's building about 16 x 16, and a sign with the inscription "New home of Kenneseth Israel Congregation."

Alfred H. Tapper testified for plaintiffs that he lived near the lots owned by defendant; that he owned lots 1, 2, and 3 on Plymouth avenue adjacent to defendant's lots; that he had been acquainted with Homewood Addition for 25 years; that he was a real estate operator and sold about 50 percent of the homes; and that he had bought and sold houses of his own in the area. He claimed that during all the time he had known Homewood Addition there had not been any change in the character of the neighborhood. He said that all of Homewood Addition was occupied by single-family dwellings except the churches, the filling station, and some duplexes on Penn avenue. He identified several pieces of property as being single-family residences. He said that the filling station and the duplexes were built about 20 years ago; that the two churches were probably the first buildings in Homewood; that across the street on Plymouth avenue there was a mixture of commercial and residential properties, but that the commercial property did not extend beyond Sheridan avenue on the Homewood Addition side of the street. He identified the location of several synagogues in the general neighborhood, none of which were in Homewood. He also testified that 95 percent of the people in Homewood Addition were Jewish.

An affidavit signed by Lester Sokol, included in the record, states that he checked the record in the office of the registrar of titles of Hennepin county and that, excluding transfers between the Security Land and Investment Company and George N. Farwell, he examined all the deeds and Torrens title certificates for transfers of property in Homewood Addition, commencing immediately after the first deed in the year 1911, and found 36 conveyances registered. Of these 36 transfers, he listed five certificates covering lots described therein with no restrictions. One of these lots was later restricted. Mr. H. Z. Mendow avers, however, in his affidavit that each

of the properties described in Sokol's affidavit has been improved with a single-family residence.

None of plaintiffs testified at the trial. We have reviewed the pertinent testimony as set forth above with a view to determining, if possible, what was the intent of the common grantors with reference to restrictions and the development of the area at the time Homewood Addition was platted and registered, since the plat clearly contained no building restrictions. None of the common grantors representing the George N. Farwell interest in Homewood Addition offered any testimony as to this intent, the only testimony being from Von Kuster and Keefe, representing the company owning the other interest in the addition jointly platted with Farwell.

■ No case has been cited by either of the contesting parties, nor have we found one, defining a general plan in Minnesota. This court said in Cantieny v. Boze, 209 Minn. 407, 409, 296 N. W. 491, 492:

"Whenever land is developed under a general plan, reasonably restrictive covenants which appear in deeds to all lots sold are enforceable alike by the vendor and by the vendees and by their successors in title. Velie v. Richardson, 126 Minn. 334, 148 N. W. 286; Godley v. Weisman, 133 Minn. 1, 157 N. W. 711, 158 N. W. 333, L. R. A. 1917A, 333; Deitrick v. Leadbetter, 175 Va. 170, 8 S. E. (2d) 276, 127 A. L. R. 849."

That was a suit to restrain defendants from operating a tourist camp upon certain lots in Pokegama Beach, a platted section along Detroit Lake in Becker county. It appeared from the record that the owners of the property, one West and wife, platted 41 lots and later executed and delivered deeds to various purchasers of lots in the plat. All of the deeds contained a restriction, in effect, that the premises should not be used by the grantee or his heirs or assigns for the manufacture or sale of intoxicating liquors or for any unlawful purpose (209 Minn. 408, 296 N. W. 492) "nor for any purpose other than as a place of residence." According to the opinion, cottages were erected on various lots, and it appears that the restriction in the deeds was part of a general plan of development

calculated to restrict the platted property to residential purposes. Plaintiff became the owner of lots 4 and 5 through conveyance from the Wests which contained the above restriction. Defendants became the owners of the adjoining lots, 6 and 7, by deed from their brother William, which contained no restriction, although the deed from the Wests to William's predecessors in title did contain the restriction. Defendants built ten small cabins on the 50-foot lot adjoining plaintiff's lots for rental purposes for overnight guests. A register of guests and cars was kept at defendants' office, which was not on these lots. The trial court held that the erection of the cabins was not a violation of the restriction contained in the West deeds. We said that the evidence was conclusive to the contrary and that the group of cottages was as much a violation of the clause as would have been the erection of a summer hotel, and that the nature of the rentals constituted what is generally termed a tourist camp. We further said in that case (209 Minn. 409, 296 N. W. 493) :

"* * * There is no question here but that the restriction contained in the West deeds was in furtherance of the general plan to develop Pokegama Beach as a strictly residential district, and therefore the restriction was available to any of the lot owners as against their neighbors in the event of its breach."

That case, however, was affirmed on the ground that there was sufficient evidence to support the court's finding of laches.

Velie v. Richardson, 126 Minn. 334, 148 N. W. 286, was an action for an injunction restraining defendant from erecting an icehouse on his premises contrary to the covenants of restriction set forth in the complaint. In that case, there were 128 lots in the tract, of which 90 had been sold under deed or agreement with restrictive covenants as to a dwelling house. The court held that the fact that two lots of the tract had been sold without "a written restriction" and that the restriction as to two more was different was not conclusive that the owner did not sell subject to a general plan of restriction which inured to the benefit of the purchaser. We there said (126 Minn. 336, 148 N. W. 287) :

"* * * We think the complaint fairly construed does show that the owners of a tract of land having platted the same into many lots with the intention of attracting purchasers, formed and carried out a plan to sell the lots subject to covenants restricting the lots to homes of a certain character. The inference is reasonable that the covenant was exacted not only to enable the owners the more readily to dispose of the lots, but also that it should be for the benefit of all purchasers, so that they might be able to dwell in a strictly residential district. It is plain that such restrictions appeal to many in selecting or buying property. Every grantee in accepting a deed with a similar restriction ought to know that thereby a right is reserved in behalf of others who may be so situated as to be entitled to the benefits of the covenant. * * * The covenant inuring to plaintiffs' benefit, they have a right which equity will protect, by injunction if necessary."

In Strauss v. Ginzberg, 218 Minn. 57, 61, 15 N. W. (2d) 130, 132, 155 A. L. R. 1000, this court said:

"* * * the fact that certain lots were sold without restrictions for church and playground purposes does not show conclusively that the owner did not sell subject to a general plan of restriction which inured to the benefit of every purchaser. In fact, it may be strong evidence that he did sell subject to a general plan of restriction."

The issues involved in the Ginzberg case, however, must not be confused with the issues in the instant case, because in that case, while it involved the same addition as we are now considering, it was stipulated that Homewood Addition was developed under a general plan. There is no such stipulation in the case at bar, as that issue is strongly contested here. In view of the stipulation as to the general plan in the Ginzberg case, the main question presented on appeal there was whether the restrictive covenant was a limitation upon the use or merely a limitation upon construction. Rabbi Ginzberg purchased lots upon which a residential building was located in all respects in conformity with the building restriction. He ad-

mitted his intention to hold religious services on the premises and to alter the residence on the premises for that purpose. He contended that the restriction in the covenant applied only to the nature of the improvement and that it did not prevent the use of the premises for religious worship by a religious organization or prevent him from remodeling the same for such purpose. We there held that the restriction applied not only to the kind of building to be erected, but also to the use of the property.

It can be seen from the above cases that we have recognized restrictions in furtherance of a general plan under certain circumstances in this state, and that where the owners of a tract of land have platted the same into many lots and formed and carried out a plan to sell the lots subject to covenants restricting them to the construction of homes of a certain character, equity will protect the rights of other grantees who accepted deeds in the same locality with similar restrictions.

It was held in Killian v. Goodman, 229 Mich. 393, 201 N. W. 454, that where there was a general plan for the development of property, which was followed by individual grantees, they had a right to enforce the restrictions against another grantee of their common grantor when such grantee bought the lots on which he intended to erect a 33-family apartment with full knowledge of all the facts that the restrictions limited construction in the area to a residence or a dwelling house. See, 4 Pomeroy, Equity Jurisprudence (5 ed.) § 1295.

■ The burden of proving a general plan of improvement was upon plaintiffs. The existence of such a general plan is a question of fact to be determined by looking to the conditions of the platting and the sale of the lots and all surrounding circumstances as indicated verbally or in writing. Beals v. Case, 138 Mass. 138; Library Neighborhood Assn. v. Goosen, 229 Mich. 89, 201 N. W. 219.

It is also necessary to consider the matter of the intention of the original owners in platting the district. In doing so, we must consider what the record shows as to the intention of the common grantors to limit the construction in the district to single-family

residences so as to prevent the construction of a house of worship on defendant's lots fronting on Plymouth avenue.

"* * * Where a scheme or plan of development is contemplated by the grantor, the language of the covenant will be given such effect as will carry out the intent of the grantor and those who purchased with the restriction in their chain of title. 14 Am. Jur., Covenants, Conditions and Restrictions, § 211." Strauss v. Ginzberg, 218 Minn. 61, 15 N. W. (2d) 133, *supra.*

In Klapproth v. Grininger, 162 Minn. 488, 490, 203 N. W. 418, 419, 39 A. L. R. 1080, this court said:

"While covenants imposing restrictions upon the use of property will not be enlarged by construction, they will be given the full force and effect intended by the parties who created them, and where the language used is clear and unambiguous it will be given its obvious meaning."

In view of the fact that at the time of the decision in the Ginzberg case in 1944 (included in the pleadings and made a part of the record in the case at bar) there were 213 single-family residences, each occupying one and one-half to three lots in the district; that according to the stipulation of June 27, 1947, all the lots which had been improved (with certain exceptions set out in the stipulation) were improved with single-family residences; that there was testimony that the area generally was developed as a residential district; that a restriction similar to the one in the record was "usually" in each deed "On most of the property" sold; and that it was "obvious" that it is a residential district, we believe that the court's findings should be sustained as to a general plan, with the exception of certain property along Plymouth avenue which we shall refer to later. We arrive at this conclusion even though the stipulation of June 27, 1947, discloses that at that time there were seven duplexes on Penn avenue between Twelfth and Plymouth avenues, a church on the corner of Penn and Oak Park avenues, a schoolhouse and playground in block 9, and a park known as Farwell Park in the addition. In addition to this, and referring specifically to the Plymouth

avenue frontage between Penn and Thomas avenues, all of this frontage is vacant according to the stipulation, except a gas station on lots 1 and 2, a doctor's office and residence on lots 28 and 29, block 1 (with a doctor's sign in front of his office at the sidewalk line facing Plymouth avenue), and a church on lots 1 and 2, block 2.

We cannot determine from the record, however, that it was ever the intention of the common grantors to restrict all the lots along Plymouth avenue from Penn to Thomas avenues to single-family residences so as to prevent defendant from constructing a house of worship on its lots, especially when its deed permitted the erection of such a building. The very nature of the avenue from Penn to Thomas avenues at the extreme north end of the addition, together with its development and the testimony of Mr. Von Kuster and Mr. Keefe, seems to preclude any such intention. So far as we can ascertain from the record, there appear to be only a few lots fronting on Plymouth, between Penn and Thomas avenues, with restrictive deeds. The deed to defendant's lots contained no restriction which would limit improvements to single residences, but, instead, restricted the improvements to "a new building to be used exclusively for religious purposes or by the erection of not more than three residential buildings costing not less than $3,500.00 each."

Mr. Von Kuster, familiar with the district from its inception, first said that the lots fronting on Plymouth avenue were not considered as residential lots and that he had no recollection of having told anyone that the lots on Plymouth avenue were limited to residential lots. He modified this somewhat by saying that the addition was developed as a residential district with the exception of Plymouth from Penn to, "I believe, it was Sheridan that we never considered." Mr. Keefe, also familiar with the district for 30 years, knew only that the lots *usually* contained a restriction, and that the addition was *generally* developed as a residential district, which he said was "obvious." He said that when he referred to a "residential district" he did not mean that the lots were sold to exclude any of them for religious purposes, explaining that there were two

Protestant churches in the district. He said that he knew some lots were sold for other purposes than single dwellings, including duplexes, two churches, a filling station, and a doctor's office. He even said that the lots which were sold to defendant were not suitable for residential purposes, and that the improvements across the street on Plymouth avenue, from Thomas to Penn, were generally of a commercial type. Mr. Kassler said that, while he knew there were restrictions in the district, he had heard that the lots on Plymouth avenue were not restricted. He went so far as to say that Mr. Tapper, who owned the lots adjoining defendant's, offered to sell them for use in connection with the synagogue, which Mr. Tapper denied.

It appears to us that, while it was the intention of the common grantors generally to restrict the construction in the area to single residences, the record is not convincing that it was ever the general intention to limit such construction on Plymouth avenue between Penn and Thomas so as to prevent defendant from constructing a house of worship on its lots. It would seem inconsistent for us to say that defendant should be restrained from constructing a building for religious purposes on its lots when its deed to the lots permits such construction, especially in view of the fact that two churches of other denominations—one on Plymouth avenue about two blocks from defendant's lots and both in Homewood Addition—had been erected not earlier than 1911 and after the district was first developed in 1906, according to the affidavits.

We hold that, while the original owners of the land platted an addition to the city of Minneapolis known as Homewood Addition and generally sold lots in it according to a general plan that it was to be a district of one-family residences, it was not the intention of such owners to include defendant's lots in such general plan so as to permit plaintiffs, under the facts and circumstances of this case, to obtain a restraining order enjoining defendant from erecting a building to be used exclusively for religious purposes on its lots, described as lots 4, 5, and 6 in block 4, Homewood Addition to the city of Minneapolis, where the record showed that the deed to

the lots from the grantors to defendant restricted improvements thereon to the erection of a new building to be used exclusively for religious purposes or the erection of not more than three residential buildings costing not less than $3,500 each.

Under the facts and circumstances of this case, the trial court did not err in finding that plaintiffs had not been guilty of laches and that they were not estopped by any act or omission on their part from bringing the action.

Reversed with directions in accordance with views herein expressed, to wit, that defendant be not enjoined from erecting a building to be used exclusively for religious purposes on its lots described in this opinion.

[1]Reported in 36 N. W. (2d) 703.