STONY RIDGE AND CARLOS VIEW
TERRACE ASSOCIATION,
INC., Appellant,

v.

Joseph N. ALEXANDER, Commissioner
of Natural Resources, Respondent.

No. C4-83-1988.

Court of Appeals of Minnesota.

Aug. 28, 1984.

Loren Magsam, Magsam, Harwig & Jude, Osseo, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Bruce A. Specktor, Sp. Asst. Atty. Gen., St. Paul, for respondent.

Heard, considered and decided by SEDGWICK, P.J., and NIERENGARTEN and RANDALL, JJ.

## OPINION

NIERENGARTEN, Judge.

Plaintiff Stony Ridge and Carlos View Terrace Association, Inc., a group of property owners on Lake Carlos in Douglas County, Minnesota, sought injunctive relief to prevent the Department of Natural Resources (DNR) from developing a public water access site on property adjacent to property owned by Stony Ridge and Carlos. The trial court held that (1) the DNR's actions complied with statutory requirements, (2) the DNR adequately demonstrated the location and construction of the site would not create a traffic hazard and that safeguards could be taken to prevent the access from becoming a public and/or private nuisance, (3) that Stony Ridge did not demonstrate irreparable harm from the DNR's actions, and (4) the DNR property was not encumbered by a reciprocal negative easement. Stony Ridge appeals. We affirm.

## FACTS

In November 1981, the Department of Natural Resources (DNR) obtained an option to purchase Lot 11 and the "Swenson property" on the west shore of Lake Carlos in Douglas County, Minnesota. Lot 11 was encumbered by restrictive covenants; the "Swenson property" was not.

In February 1983, the DNR purchased the Swenson property for a public water access site. Stony Ridge sought to enjoin the DNR from such development on the ground that the original grantor of Lot 11 and the Swenson property had placed restrictions on the use of adjacent land owned by Stony Ridge and, therefore, the restrictions also apply to the Swenson property. This argument is based upon the doctrine of negative reciprocal easements. Following judgment dismissing plaintiff's action, plaintiff appeals.

## ISSUES

1. Does the doctrine of negative reciprocal easements apply to the parcel purchased by the DNR?

2. Did the DNR comply with Minnesota law authorizing creation of a public water access site?

3. Does a DNR policy statement constitute a rule so as to grant Stony Ridge a cause of action for alleged violations?

## ANALYSIS

### Standard of Review

In reviewing the decision of the Department of Natural Resources to locate a public water access site, we are confined to the following standard of review:

> The oft-stated standard employed in reviewing decisions of administrative agencies is that those decisions shall be sustained unless, upon independent evaluation, it is determined that they are unsupported by substantial evidence, based upon errors of law or are arbitrary and capricious.

*Hennepin County Court Employees Group v. Public Employment Relations Board,* 274 N.W.2d 492, 494 (Minn.1979).

### I

#### Reciprocal Negative Easement

The Michigan Supreme Court defines and explains a reciprocal negative easement as follows:

There must have been a common owner of the related parcels of land, and in his various grants of the lots he must have included some restriction, either affirmative or negative, for the benefit of the land retained, evidencing a scheme or intent that the entire tract should be similarly treated. Once the plan is effectively put into operation, the burden he has placed upon the land conveyed is by operation of law reciprocally placed upon the land retained. In this way those who have purchased in reliance upon this particular restriction will be assured that the plan will be *completely* achieved.

*Lanski v. Montealegre*, 361 Mich. 44, 47, 104 N.W.2d 772, 773 (1960) (emphasis in original).

The trial court found the DNR land was not owned by the same owner who platted and encumbered the Stony Ridge and Carlos View Terrace subdivisions. The DNR land and Stony Ridge subdivision were all owned by the Swensons at one time but there is no evidence that the Swensons intended all the property was to be burdened by restrictive covenants to carry out some general plan of development. Swensons sold some of their land, unencumbered, to Kroupa, who then platted it as Carlos View Terrace and restricted its use. Swenson then purchased Lot 11 in Carlos View and joined it with adjacent unencumbered property Swenson owned. Swenson then sold this latter parcel to the DNR unencumbered.

■■■ A negative reciprocal easement cannot be created without a common grantor. *Id.* at 46–47, 104 N.W.2d 773. This has been recognized in every leading case in Minnesota. *See e.g. LaValle v. Kulkay,* 277 N.W.2d 400 (Minn.1979). There being no common grantor and no proof Swenson intended a general plan of development, the negative reciprocal easement theory of recovery must fail. *Rose v. Kenneseth Is-*

*rael Congregation,* 228 Minn. 240, 253–54, 36 N.W.2d 791, 798 (1949).

## II

### Was There Compliance With Minn.Stat. § 86A.05?

The DNR is authorized by Minn.Stat. §§ 97.48, subd. 15[1] and 86A.05, subd. 9 (1982) to purchase and construct public water access sites using the following selection criteria:

(1) The body of water to which access is being provided and surrounding lands can withstand additional recreational use without undue damage to the environment or undue risks to the health and safety of water users;

(2) Public access to the body of water is either nonexistent or inadequate.

Minn.Stat. § 86A.05, subd. 9(b) (1982).

### a. *safety of access*

■■■ The trial court found that (1) the stopping site distances on the highway leading to the proposed access are within the minimum standards of the Department of Highways and (2) the proposed plan for construction of the site includes leveling the grade of the access road at its approach to the highway to improve visibility. The trial court based these findings on the testimony of the county highway engineer, who testified there was adequate stopping distance at the access according to accepted standards, the speed limit of 50 m.p.h. could be reduced if necessary and "no parking" signs could be placed along the highway. There was testimony that possibly 30 cars a day would enter and leave the access site during the fishing season out of a current traffic volume of approximately 300 cars a day. From that testimony, the court concluded:

2. The defendants have demonstrated that the location and construction of the access would not create a traffic hazard

---

1. Minn.Stat. § 97.48, subd. 15 (1982), provides in part:

The commissioner shall acquire by gift, lease, purchase, or condemnation in the manner prescribed by chapter 117, in the name of the

state, state water access sites, not to exceed seven acres, adjacent to public waters to which the public theretofore had no access or where the access is inadequate * * *.

*Id.*

and that safeguards can be taken to prevent the access becoming a public and/or private nuisance.

3. The plaintiff has demonstrated no irreparable harm from the action of the defendants.

These findings are substantially supported by the evidence and are not clearly erroneous.

b. *adequacy of access to Lake Carlos:*

The trial court found:

3. The guidelines and criteria to be followed in establishing state water access sites as adopted by the Minnesota Department of Natural Resources provide that 75 car-trailer parking spaces would be adequate for a lake of the size of Lake Carlos.

4. There are currently in existence 19 car-trailer parking spaces on Lake Carlos, none of which are located on the west and southwest shores. The proposed site will accommodate 15 parking spaces.

5. Prior to the selection of the site in question for the installation and construction of a public access, the Department of Natural Resources considered and rejected all possible alternate sites, including lakeshore presently owned by other units of government, on the grounds that the alternate sites were not feasible and did not have the development potential to meet the standards and criteria of the Department of Natural Resources for public access sites.

These findings are substantially supported by the evidence and are not clearly erroneous.

### III

### Is the DNR Policy a Rule?

Stony Ridge argues that the December 13, 1979, DNR "State Water Access Site

**2.** The Policy Statement requires the DNR, among other things, to:
  1. locate access sites on public waters where access is non-existent or inadequate;
  2. consider the use of public property in establishing access sites;

Policy" [2] constitutes a "rule" within the meaning of Minn.Stat. § 14.02, subd. 4 (1982) thereby entitling Stony Ridge to challenge the DNR's water access site selection as an agency decision-making process under the Minnesota Administrative Procedure Act, Minn.Stat. §§ 14.01–.69 (1982 & Supp.1983).

The Administrative Procedure Act defines a rule as follows:

"Rule" means every agency statement of general applicability and future effect, including amendments, suspensions, and repeals of rules, adopted to implement or make specific the law enforced or administered by it or to govern its organization or procedure. It does not include (a) rules concerning only the internal management of the agency or other agencies, and which do not directly affect the rights or procedure available to the public; * * *

Minn.Stat. § 14.02, subd. 4 (1982).

To determine whether a policy is a rule under this statute, one first looks to see if the policy falls within the general definition of a rule. *McKee v. Likins*, 261 N.W.2d 566, 577 (Minn.1977). If the policy may be defined as a rule, then one should determine whether the policy falls within any listed exceptions to the definition of a rule. *Id.*

The DNR policy is not a rule. It merely restates statutory requirements for site selection and guides internal management. Minn.Stat. § 14.02, subd. 4(a) (1982). The trial court correctly granted summary judgment to the DNR.

### DECISION

1. The DNR land is not restricted in use by a negative reciprocal easement.

  3. minimize potential problems, development costs and long term maintenance;
  4. consider the proximity of proposed access sites to population centers; and
  5. establish sites that have safe access to public roadways and that have enough space for turn around, buffer and parking.

2. The trial court finding that the DNR complied with Minnesota law in selecting the proposed public water access site in that access was inadequate on the lake and the selected site was safe, is not clearly erroneous.

3. The DNR policy regarding the location of public water access sites only controls internal management and does not constitute a rule under Minnesota law.

Affirmed.