LANSKI v. MONTEALEGRE.

1. COVENANTS—RECIPROCAL NEGATIVE EASEMENT.
    A reciprocal negative easement arises when the common owner of land in making grants of lots therein includes some affirmative or negative restriction for the benefit of the land retained evidencing a scheme or intent that the entire tract should be similarly treated, and once the plan is effectively put into operation the burden placed upon the land conveyed is, by operation of law, reciprocally placed upon the land retained and the purchasers relying upon the restriction thereby assured that the plan will be completely achieved.

2. SAME — RECIPROCAL NEGATIVE EASEMENT — COMMERCIAL USE — SUMMER RESORT SUBDIVISION.
    The restriction in plaintiffs' lots in private summer resort subdivision against commercial use, imposed by the common owner, *held*, to have effected a reciprocal negative easement, notwith-

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 14 Am Jur, Covenants, Conditions and Restrictions § 193.
[3] 14 Am Jur, Covenants, Conditions and Restrictions § 218.
[4] 14 Am Jur, Covenants, Conditions and Restrictions § 242.
[5] 14 Am Jur, Covenants, Conditions and Restrictions § 357.

standing such common owner conducted on his retained lot the sale of lots or rental of cottages, a water supply system, and a garbage pickup service for it and other areas adjacent to the subdivision, such latter incidental services helping to make the area more desirable for the purpose used.

3. SAME—COMMERCIAL ACTIVITY—PROFIT.

Commercial activity, as used in covenants, in deeds, includes any type of business or activity which is carried on for a profit.

4. SAME—RECIPROCAL NEGATIVE EASEMENT—COMMERCIAL USE—CONVALESCENT HOME.

Operation of a convalescent home for profit open to the public that can afford to pay *held*, to constitute a commercial use of property subject to restriction against such use by reciprocal negative easement imposed by common owner of the subdivision in which defendants' lot was located.

5. SAME—RECIPROCAL NEGATIVE EASEMENT—COMMERCIAL USE—ENFORCEMENT—LACHES.

Claim of laches *held*, without foundation in suit by owners of lots in subdivision which had been subjected to a reciprocal negative easement against use for commercial purposes by common owner, and no proscribed commercial activity took place until the establishment of convalescent home by defendants the year before suit was commenced.

Appeal from Berrien; Hadsell (Philip A.), J. Submitted April 12, 1960. (Docket No. 48, Calendar No. 47,924.) Decided September 15, 1960.

Bill by Louis Lanski and other property owners against Harry Montealegre and Hazel Montealegre to enforce lot restriction and enjoin commercial activity in resort subdivision. Decree for plaintiffs. Defendants appeal. Affirmed.

*Theron D. Childs, Jr.,* for plaintiffs.

*Small, Zick & Shaffer (Hahn & Zimmerman,* of counsel), for defendants.

Souris, J.  In 1919 William Eiler, defendants'
predecessor in title, acquired title to about 20 acres
of land near Lake Michigan in Berrien county.  The
land was unimproved except for 3 buildings and a
residence located on what is now known as lot 1.
Until about 1922 Mr. Eiler and another conducted a
hotel and restaurant business in those buildings.  In
1922 Mr. Eiler and his partner divided the land,
his partner taking the business and moving it across
the road, Mr. Eiler retaining part of the land, .in-
cluding lot 1, as well as a 30-foot access strip to Lake
Michigan.  He continued to maintain his residence in
a stone house on lot 1.  In 1923, 12–1/2 acres of the
Eiler land were subdivided, but the plat thereof was
not recorded.  Beginning in October of 1923, lots
were sold or improved and rented by Mr. Eiler, such
sale and rental business being conducted from an
office in his residence on lot 1.  As the number of
residents increased in his subdivision, Mr. Eiler sold
water through a pipeline he established throughout
the subdivision, and he operated a garbage disposal
business.  The office work and bookkeeping for these
enterprises were conducted from the office in his resi-
dence on lot 1.

The plaintiffs are owners of lots in the subdivision
and trace title to Mr. Eiler.  All of their deeds, and
almost all of the deeds executed by Mr. Eiler, contain
restrictions against using the lots conveyed for com-
mercial purposes.  Although the wording varies
somewhat, a typical restrictive clause reads as fol-
lows:

"Second parties and their successors and assigns
shall not use said premises for any commercial enter-
prise or engage in any commercial undertaking
thereon; it being expressly understood and agreed
that renting single or duplex cottages is not consid-
ered commercializing."

The Eilers retained lot 1, and it has passed by succession to the present defendants. In 1954 the defendants established a convalescent home on lot 1 in the building formerly used as the residence. That same year plaintiffs notified the defendants that · such a use of lot 1 was a commercial undertaking; that the language in their deeds attached a reciprocal negative easement to lot 1; and that defendants' use of lot 1 as a convalescent home was in violation thereof. Since defendants continued to operate the home, plaintiffs instituted this action seeking an injunction in November of 1955. The lower court found that a reciprocal negative easement had been created and that the operation of a convalescent home was a violation of the restriction. A decree was entered permanently enjoining defendants' use of the land for such purpose.

Both parties agree upon the definition and effect of a reciprocal negative easement. There must have been a common owner of the related parcels of land, and in his various grants of the lots he must have included some restriction, either affirmative or negative, for the benefit of the land retained, evidencing a scheme or intent that the entire tract should be similarly treated. Once the plan is effectively put into operation, the burden he has placed upon the land conveyed is by operation of law reciprocally placed upon the land retained. In this way those who have purchased in reliance upon this particular restriction will be assured that the plan will be *completely* achieved. See *Sanborn* v. *McLean,* 233 Mich 227 (60 ALR 1212); *Denhardt* v. *De Roo,* 295 Mich 223; *Cook* v. *Bandeen,* 356 Mich 328.

That there was in this case a common owner of related parcels of land cannot be denied. Further, he was systematic in his inclusion of a covenant against the commercial use of the lots conveyed. The difficulty here lies in the fact that at the time of these

conveyances, Mr. Eiler used the office in his residence on lot 1 in connection with his various enterprises, *viz.*, selling lots and renting cottages in the subdivision, selling water, and a garbage disposal service. The defendants assert that since lot 1 was being used for such "commercial" purposes at the time the plaintiffs purchased their lots, they could not have relied upon a future noncommercial use of the retained lot. They contend that the only plan or scheme evidenced by the restrictions is that the grantor was jealously guarding against competition by preventing any of the lots sold to be used for commercial purposes, meanwhile continuing his commercial use of the land retained. If such were true, 2 elements necessary for a reciprocal negative easement would be lacking: (1) reliance, and (2) an intent or general plan that the entire tract retained should be similarly restricted.

The question presented in the first instance, therefore, is whether or not lot 1 at the time of the conveyances was being used commercially within the scope of the deed restrictions. It should be noted that the restriction quoted above, and others used, expressly excludes renting cottages from the ban on "commercializing". This was one type of transaction Mr. Eiler conducted from his residence office on lot 1. Another was the sale of the lots within the subdivision. Such activities cannot be said to negative a reliance by plaintiffs that a general commercial activity would not be conducted on lot 1. Sale of the lots was necessary for the improvement of the subdivision, and the fact that Mr. Eiler conducted the sales from his home does not lend a commercial atmosphere to the site. Nor can his activities be said to negative an intent or general plan that the entire subdivision should be noncommercial in character. Such activities certainly do not lead us to the conclusion that the restrictions were to protect him

from competition in his real estate business. No one else owned the subdivision to sell.

The remaining enterprises conducted from lot 1 are 2 "land improvement" type endeavors which would tend to make the lots of his subdivision more desirable and therefore more easily sold. A water system and a pick-up service for garbage are virtual necessities now and were at the time of the conveyances. These "businesses" were no more than incidental to the sale of the subdivided lots, fringe benefits without which the area would be less desirable for a private summer resort. The fact that Mr. Eiler subsequently extended these services to areas adjacent to his subdivision does not make his use of lot 1 into a commercial activity. It only served to further the desirability of the entire area. The facts indicate an intent or general plan that the whole subdivision was to be a summer resort area. There are no elements lacking. The restriction against a commercial use was attached to lot 1 by virtue of the doctrine of reciprocal negative easements.

Even so, defendants contend, a nursing or convalescent home cannot be construed as "commercial activity." Perhaps at its inception the term commerce was particularly applicable to a mercantile activity, the buying and selling of goods. This is, of course, still its meaning in the narrow sense today. But the general plan for a *private resort area* found from the above facts indicates that a broader definition was intended. In its broad sense commercial activity includes any type of business or activity which is carried on for a profit. *Mechanical Farm Equipment Distributors, Inc.*, v. *Porter* (CCA 9), 156 F2d 296; *City of Sioux Falls* v. *Cleveland*, 75 SD 548 (70 NW2d 62).

Defendants operate a convalescent home. A fee is charged and a profit is made. The services are open to the public if they can afford to pay. The

patients, the visitors, the nurses, and the over-all atmosphere detract from the general plan of the private, noncommercial resort area originally intended. Defendants' convalescent home is a commercial use of lot 1, in violation of the reciprocal negative easement imposed thereon by defendants' predecessor in title.

A further claim is made that the plaintiffs are guilty of laches. Since we find that no commercial activity in violation of the reciprocal negative easement took place until the establishment of the convalescent home in 1954, such claim is without foundation.

Decree affirmed. Costs to plaintiffs.

DETHMERS, C. J., and CARR, KELLY, SMITH, BLACK, EDWARDS, and KAVANAGH, JJ., concurred.