Carroll,
No. 5607.

MARGUERITE FOURNIER & a.

*v.*

GEORGE T. KATTAR & a.

Argued October 4, 1967.
Decided January 30, 1968.

*Upton, Sanders & Upton* ( *Mr. Richard F. Upton* orally ), for the plaintiffs.

*James D. O'Neill* and *Mr. Joseph C. Cressy* ( of Massachusetts ) ( *Mr. O'Neill* orally ), for the defendants.

PER CURIAM. On December 30, 1948, Joseph I. Melanson acquired the property in question from the Forest Trading Co. In February 1949, he prepared a plot plan which showed the entire shore line subdivided into 103 lots of various sizes and named "Castle Shores." The remainder of the property, which had no shore frontage and consisted of about 600 acres, was not subdivided on the plan. This plan was recorded January 31, 1950. In May 1950 Melanson conveyed without restrictions Lots 101, 102 and 103 and twenty-three acres of backland adjoining Lot 103. One of these lots has been used for a marina and grocery store. Sometime around April 1952, F. A. Richardson, as agent for Melanson and with his approval, circulated a "Partial Price List," entitled "Castle Shores" and dated April 1952, which listed 103 lots together with their dimensions and prices. Lots 101, 102 and 103 were listed as "sold" as were certain other lots. Twelve lots were marked "Reserved." This price list included certain restrictions which it was stated were excerpted "from Standard Deed Form." These restrictions after imposing certain set-back and building requirements stated in part as follows: "subject to the following restrictions which the grantee by acceptance of this instrument agrees for himself, his heirs, successors or assigns, to keep for the grantor and the succeeding owners of any and all portions of said property known as Castle Shores which lie within one thousand ( 1,000 ) feet of any part of the within described property, and all persons who shall acquire directly or indirectly, the grantor's interest in the promotion and development of any part of said Castle Shores: — The premises conveyed hereunder shall be used for residential purposes only and the usual and natural uses in connection

therewith. Not more than one dwelling shall be erected, permitted or maintained on the premises conveyed hereunder, which shall be designed for use by not more than one family, but this shall not be construed to forbid the construction and use of a bona fide guest house in connection therewith."

Restrictions essentially the same as these were included by Melanson in some forty-eight deeds conveying waterfront lots, including those to the plaintiffs. Each deed referred to the recorded plans only for the purpose of identifying the lot conveyed.

At the time Melanson acquired the property, some of the "backland" had been sold by his predecessor without restrictions. Melanson acquired this land either by purchase or exchange for waterfront lots. Melanson died in 1962 without ever having subdivided any of the backland into lots and not having sold twenty-eight of the waterfront lots. Eight of the twelve lots which had been marked "Reserved" on the price list had been sold with the standard restrictions. Melanson's executors negotiated to sell the balance of Castle Shores to the defendant. Upon learning of this, plaintiffs' attorney advised the executor of their claim that the sale should be subject to the standard restrictions. The executors agreed but the defendant refused to purchase with restrictions. The executors then conveyed without restrictions by deed dated October 9, 1964, but not before the defendant was given notice by the plaintiffs through his attorney that they claimed the existence of mutual equitable servitudes.

The Trial Court found that the defendant had notice of plaintiffs' claim prior to taking the deed, that the omission of the restrictions in the deed to him was immaterial, and that he acquired title "subject to an equitable servitude in favor of the plaintiffs in accordance with the so-called 'standard restrictions.' "

After acquisition of the property the defendant announced plans to create five community beaches on certain waterfront lots for the benefit of prospective purchasers of back lots, and to provide playground-type structures, docks, wharves, parking areas and picnic facilities thereon. The areas proposed to be used for these purposes involve only one of the four remaining lots originally marked "Reserved" on the price list.

The Trial Court decreed that the "standard restrictions" were "binding upon and applicable to all the remaining land conveyed by the Melanson Estate to the defendant" and enjoined and

restrained the defendant from conveying any of the land without inserting the restrictions in each conveyance. No exceptions to these decrees are before us.

The Trial Court, however, ruled, subject to plaintiffs' exception, that the establishment by the defendant of community beaches and other recreational facilities on some of the unsold shore lots was not precluded by the restrictions. It pointed out that Melanson had reserved the right to create a means of access to and from all parts of the development without restriction to waterfront owners and found that the proposed uses of waterfront lots were "in keeping with the uniform plan of development and . . . the residential pattern which was adopted as part of the original general scheme . . . " and that they were "ordinary and reasonable as well as natural and incidental to the general scheme calling for overall residential uses in a recreational area for the mutual benefit of the developer and owners." The Court ruled that it would be inequitable "to deny back land lot owners within the development access to the lake, particularly in the absence of any credible evidence . . . so restricting its use" and that it would also be inequitable and a hardship to preclude the developer from making the proposed uses.

We are of the opinion that the findings and rulings of the Trial Court are sustainable upon the record. Its decree enjoining the defendant from conveying any of the unsold land without incorporating in the deeds the so-called standard restrictions is not questioned by the parties. The development of the unsold land could be found to stand upon a different footing. The language of the restrictions indicated with reasonable clarity that the purchasers were agreeing to "keep" or comply with them, "for the grantor and the succeeding owners of any and all portions of said property known as Castle Shores . . . and all persons who shall acquire . . . the grantor's interest in the promotion and development of any part" of the same.

While the evidence warranted the finding that the restrictions were understood to be for the reciprocal benefit of individual grantees *inter se* as a part of the general scheme of development, the emphasis of the restrictions was upon benefit "for the grantor" and succeeding developers of "any part" of the tract. That this was a factor in the Court's decision is indicated by its several references to the intent to perpetuate the general scheme "for the

benefit of the developer"; the express reservation by the grantor "for his own benefit and for the benefit of 'succeeding owners' "; and "rights . . . reserved for the benefit of the original grantor and his successors in title . . . . "

The understanding of the parties in this regard was highlighted by the testimony of the developer's agent, Richardson, called as a witness by the plaintiffs, who testified that it was the developer's understanding that the restrictions were to "apply to all lots *sold*" (Emphasis supplied), and that "prospective customers" were advised that they would so apply.

The evidence did not require a finding that property retained by the developer and not subsequently sold for house lots would be restricted to residential use. The understanding of the parties in this respect could be found to fall within the limitations stated in *Nashua Hospital* v. *Gage,* 85 N. H. 335, 341, and relied upon in *Bouley* v. *Nashua,* 106 N. H. 74, 79: "if there had been an agreement that giving [the] deed . . . also imposed upon [the grantor] an obligation as to his remaining land, one would naturally expect that it would have been expressed rather than left to dubious inference." See also, *Varney* v. *Fletcher,* 106 N. H. 464, 468.

Since no such agreement restricting the developer himself to residential use was expressed in the deeds, and since the Court found no basis for so finding in the conduct of the parties or the surrounding circumstances (*Bouley* v. *Nashua, supra,* 78), an injunction against the recreational use, proposed by the defendant "for the benefit of all owners within the development," was properly denied.

The plaintiff argues that the Trial Court's findings and rulings were influenced by testimony improperly received, and should be set aside for that reason. (*Smart* v. *Huckins,* 82 N. H. 342, 347, 348; 2 Am. Law of Property, *s* 9.29, *p.* 418). We cannot so interpret the findings and rulings. The evidence in question consisted of testimony regarding conversations between Melanson and others concerning his understanding of the word "reserved," and his practice with respect to "reserved" lots in other developments. The conversations occurred several years after the conveyances to the plaintiffs and others, when the plaintiffs were not present. Nor were they aware of the conversations. With respect to this evidence the Court made findings and rulings to which the plaintiffs seasonably excepted. The Court ruled that

the "burden as to the meaning of the language used . . . rested with the plaintiffs," and found there was "no clear or concise understanding" by the plaintiffs and the original developer as to the meaning of the word "reserved." The Court further ruled that the plaintiffs failed to sustain their burden and found that "in any event" all but four of the reserved lots were sold at the time of the conveyance to the defendant.

In the light of the findings and rulings, and in particular the ruling that the plaintiffs had failed to sustain their burden of proving the significance of the "reserved" lots, only one of which is proposed to be used for recreational purposes, we see no reason to conclude that the Court relied upon the evidence assailed by the plaintiffs, in concluding that the use proposed by the defendant would not violate any restriction binding upon him.

The plaintiffs' request for a finding that the word "reserved" was not understood by the parties to mean that the lots were reserved "for the purpose of serving as community beaches in which rights could be granted to back lots" was not denied by the Trial Court, but was stated to have been "covered, in the Court's opinion," by his findings and rulings.

The findings and decree that the restrictions are "binding upon and applicable to" the land owned by the defendant were defined and applied by the further decree enjoining the defendant against future conveyances without incorporation of the standard restrictions. They were qualified however by the findings and rulings that the restrictions do not preclude the use proposed by the developer, and by the decree enjoining the plaintiffs from interference with the "proposed development [by the defendant] of five . . . beach areas for the purposes" stated in the findings. We hold that these decrees are supported by the record.

*Exceptions overruled.*

GRIMES, J., *dissenting:* The Trial Court determined without exception that Kattar took title "subject to an equitable servitude in favor of the plaintiffs in accordance with the so-called 'standard restrictions'" and that the "standard restrictions" were "binding upon and applicable to all the remaining land conveyed by the Melanson Estate to defendant" which was "subject to the implied equitable servitudes."

Not only were no exceptions taken to these findings of the

Trial Court, but they were correct. This is a classic case of an implied reciprocal servitude which is imposed by implication of law upon the developer and the remaining land. The conveyances were made in accordance with a general scheme, with reference to a plan, the same restrictions were included in forty-eight deeds, they were stated to be for the benefit of the remaining land, and representations were made that the same restrictions would be inserted in all deeds. There is no statement that the developer or the remaining land was not to be so restricted. Under these circumstances, the restrictions became mutual and binding on all the remaining land and enforceable against the developer and his grantees and not just among lot owners *inter se. Sanborn* v. *McLean,* 233 Mich. 227; *Lanski* v. *Montealegre,* 361 Mich. 44; *Edwards* v. *Surratt,* 228 S. C. 512; *Rieger* v. *Wessel,* 319 S. W. 2d 855 (Ky. App.); *Mienner* v. *Lynchburg,* 204 Va. 180. See Annots. 60 A. L. R. 1216; 144 A. L. R. 916; 20 Am. Jur. 2d, Covenants, *s.* 173, *et seq.*

The statements in the deeds that the restrictions were to be kept for the grantor and succeeding owners of "any and all portions of . . . Castle Shores which lie within 1,000 feet" and the representations to purchasers that identical restrictions would be inserted in all deeds, rather than showing that the restrictions did not apply to the developer, form an important basis for the imposition of implied reciprocal servitudes and under some cases are an indispensable ingredient. This is a fair rule which was designed to prevent the very kind of injustice to purchasers in such developments as is now being upheld.

It is my opinion that the admissible evidence in this case supported, if indeed it did not require, the above findings of the Trial Court and that the "standard restrictions" properly interpreted determine the rights and obligations of the parties. Their meaning, like the meaning of all written instruments, is ultimately for this Court, so that a finding by the Trial Court may be disregarded. *Hogan* v. *Lebel,* 95 N. H. 95; *Smart* v. *Hernandez,* 95 N. H. 492; *Murray* v. *Peabody,* 106 N. H. 319; *Kennett Corporation* v. *Pondwood Co.,* 108 N. H. 30.

Under these restrictions the land conveyed and the land retained by the grantor could be used for "residential purposes only and the usual and natural uses in connection therewith." This language is not ambiguous and therefore its meaning is not to

be determined by resort to parol evidence. See *Gillis* v. *Bailey*, 21 N. H. 149, 158. In fact the words "residential purposes only" are themselves such plain and ordinary words that it is difficult to give them a definition which is more expressive of their meaning than the words themselves. "Residential purposes" means for the purpose of an abode. The word "only" means "only". It means to the exclusion of all else. *Moore* v. *Stevens*, 90 Fla. 879. While the "usual and natural uses in connection therewith" are permitted, the use of the conjunctive word "and" indicates that these uses are permitted only in conjunction with a residential use of each lot. It is also clear that the lots were to be used only for single-family dwellings with a bona fide guest house "in connection therewith."

Neither a community beach, picnic area, parking lot, nor a wharf is a residence and the use of any of the waterfront lots for any or all of these purposes necessarily prevents these lots from being used for residential purposes. *Klapproth* v. *Grininger*, 162 Minn. 488; *Braes Manor Civic Club* v. *Mitchell*, (Texas App.) 368 S. W. 2d 860. The use of certain of the shore lots by large numbers of people would be at odds with the obvious intention to restrict the lots to use by one family and their guests so as to prevent "too dense a population." *Gillis* v. *Bailey*, *supra*, 157.

Whether the Court is saying that when the Trial Court made the finding that the restrictions applied to Kattar and the remaining land, he didn't really mean it, or that he meant it but made it because he thought the restrictions would not prevent the uses in question and that therefore his finding of applicability should be limited to his construction of the restrictions, or that he was wrong in making the finding of applicability, I will not attempt to say. All are unacceptable to me, however. The Trial Court's well-worded findings give clear evidence to me that he did not improperly make his findings of applicability dependent upon his construction of the restrictions, but rather that he found them applicable but misconstrued them. This is evident from such statements as that the questioned uses are "not commercial or public" and that they would be "appurtenant to lots" in the development. It is also apparent that he improperly considered his view of what was equitable in construing the restrictions.

Neither we nor the Trial Court have a right to modify the

restrictions in accordance with our view of what is equitable. In any event, there is nothing inequitable about denying owners of back lots access to the lake in violation of the rights of the front lot owners. They all had knowledge of the restrictions and plaintiffs' claim when they purchased their lots. My heart goes out, however, to the owners of the front lots who have invested their money in reliance on the shorefront being restricted to residential purposes only but who now will find themselves adjacent to what for all practical purposes is a public beach and playground if people occupying 600 acres of individual lots and their guests are funnelled into these areas.

The granting to purchasers of shore lots the right to use roads through the back land to get to the highway cannot be construed, as the Trial Court did, as an exclusion of any of the shore lots from the standard restrictions or the reservation of the right to create a means of access to the lake.

The Trial Court admitted evidence relating to the meaning of the word "Reserved" opposite some of the lots on the "price lists" but found this evidence to be "doubtful at best" and found that "no clear or concise understanding existed between the plaintiffs and the original developer as to the meaning of 'Reserved.'" He then ruled that the burden as to the meaning of this word and the planned use of those areas was on the plaintiffs. I do not agree. The developer created the reciprocal restrictions. If any of the land in the development was to be excluded from these restrictions, the obligation was on him to set forth these exceptions in clear and unequivocal language. If the words he chooses are ambiguous so that their meaning cannot be clearly determined, they should be construed "to the disadvantage" of the person using them. *Smart* v. *Huckins,* 82 N. H. 342; *Pettee* v. *Chapter,* 86 N. H. 419, 429-430.

In addition, the Trial Court admitted a substantial amount of evidence relating to the intention of Melanson with respect to his plans for the development of the back land. This took the form of alleged statements to his son and others and notes made for him by his wife when he was ill. Since these alleged statements were neither in the presence of nor communicated to the plaintiffs, they were inadmissible to show that the standard restrictions did not apply with full force to all portions of the land in the development. *Smart* v. *Huckins,* 82 N. H. 343, 347; *Pettee* v. *Chapter,* 86 N. H. 419; *Barclay* v. *Dublin Lake Club,* 89 N. H. 87.

The court does not deny that this evidence was improperly admitted, but decides that the Trial Court did not rely upon it in making his findings to which exceptions were taken, although he did not so state and although the court itself relies upon some of this evidence in upholding the Trial Court.

While I would decide the case here and now adversely to the defendant, I think there should at very least be a new trial.