Kelly, J.
I respectfully disagree with the majority’s conclusions. The analysis characterizing the operation of family day-care homes as a commercial use is conclusory, providing an unworkable standard for determining whether future uses are residential or commercial. Additionally, the opinion all but eviscerates the public policy doctrine long recognized in this state’s case law.
I would hold that the family day-care homes involved here are residential in nature and do not violate restrictive covenants prohibiting commercial and business use. I would hold also that the covenants prohibiting the operation of family day-care homes *84 are contrary to public policy and, therefore, are unenforceable.
I. RESTRICTIVE COVENANTS
In determining that a family day-care home is a commercial or business use of real property, the majority places great weight on compensation. It relies on a single sentence contained in Lanski v Montealegre[1] that broadly defines commercial activity as any activity motivated by profit.
However, as evidenced in the majority’s discussion of that case, profit was not the determinative factor in concluding that the defendant’s nursing home was a commercial activity. Instead, the Court also considered the effect of the home’s activity on the general plan of the area, which was originally intended as a private resort area. Id. at 49-50.
The Court used a similar approach with respect to adult foster homes in City of Livonia v Dep’t of Social Services, 423 Mich 466; 378 NW2d 402 (1985). There it held that such homes do not violate restrictive covenants limiting land use to residential purposes and prohibiting noxious or offensive trade, manufacturing, secondhand merchandising, and wrecking businesses. The mere fact that adults living there made payments for certain items and services did not transform residential activities to commercial activities. Id. at 529.
These cases illustrate that land use should be characterized according to how the activity involved there affects the general plan of the area. This approach is prevalent in cases involving residential use covenants. *85 See, e.g., Wood v Blancke, 304 Mich 283; 8 NW2d 67 (1943); O’Connor v Resort Custom Builders, Inc, 459 Mich 335; 591 NW2d 216 (1999); Beverly Island Ass’n v Zinger, 113 Mich App 322; 317 NW2d 611 (1982). While usual, ordinary, and incidental use of property as a residence does not violate a residential use restriction, unusual and extraordinary use might. The determination focuses on the particular facts of the case. Wood, supra at 289. No logical reason has been shown why a similar approach should not be employed in cases involving commercial and business use restrictions.
This approach also honors the intent of the parties by considering use restrictions in their entirety and in light of the particular facts of the case. It produces the proper standard for characterizing property use, not the narrow approach of the majority, which focuses on a single consideration.
Applying that analysis here, no showing has been made that the operation of defendants’ family daycare homes had any effect on the overall residential character of their neighborhood. Nor is there any evidence other than compensation that supports a conclusion that the family day-care homes were commercial or business activities. It is important to note that this case was decided on stipulated facts. As a result, the record contains limited information about the operation of the family day-care homes. It includes the parties’ stipulations to the deed restrictions, defendants’ operation of a family day-care home in their private residences, and the parties’ ownership of land within the subdivision. There is no evidence regarding the pedestrian and vehicular traffic associated with the day-care homes or its effect on the subdivision. Thus, it is impossible to conclude from the *86 record that the family day-care homes do not conform to the ordinary and common meaning of “use for residential purposes.”
In light of these facts, the restrictive covenants do not compel a ruling for plaintiffs.[2] They address the residential nature of the neighborhood. To protect it, they prohibit activity that might become an annoyance to the neighborhood.
The restriction prohibiting commercial and business enterprises echoes the intent to prevent such activity. It also prohibits the storing of equipment used in a commercial or industrial enterprise, an activity that visibly changes a neighborhood. It is this visible adverse effect on the residential character of the neighborhood that the restrictions seek to prevent, not a discrete activity such as that involved here. I would conclude that the restriction prohibiting *87 commercial and business enterprises limits those activities visibly affecting the residential nature of the neighborhood.
It is apparent from the interpretations of the terms “commercial, industrial, or business enterprises” that have been advanced by this Court that there is considerable disagreement about their meanings. The absence of a definition in the restrictive covenants leaves the ambiguity unresolved and opens the terms to judicial interpretation. See Craig v Bossenbery, 134 Mich App 543, 548; 351 NW2d 596 (1984). Restrictive covenants must be reasonably construed. Boston-Edison Protective Ass’n v Paulist Fathers, Inc, 306 Mich 253, 257; 10 NW2d 847 (1943).[3] And they are strictly construed against the party seeking to enforce them, all doubts regarding the restrictions being resolved in favor of the free use of property. City of Livonia, supra at 525.
Applying these rules of construction, I cannot agree with the majority’s conclusion that the restrictive covenants prohibit family day-care homes. The majority’s absolute prohibition of all forms of activity generating compensation would preclude activities that normally have no visible effect on a community, such as babysitting services and freelance writing.
The effect of the activity is relevant where the meaning of the restrictive covenants and the question of breach is uncertain. See Oosterhouse v Brummel, 343 Mich 283, 289; 72 NW2d 6 (1955). When considered in the context of the other restrictions, it is unlikely that the majority’s broad interpretation of the *88 covenants is what was intended. Accordingly, the effect on the neighborhood is relevant to a decision whether the operation of a family day-care home violates a covenant prohibiting commercial or business use. The majority’s is an extreme construction and one that unnecessarily constrains the use of residential property.
Therefore, I would hold that the defendants’ family day-care homes do not violate the restrictive covenants prohibiting commercial or business uses.
H. PUBLIC POLICY
Even if the operation of family day-care homes were violative of plaintiffs’ restrictive covenants, the covenants are contrary to public policy and cannot be enforced. Public policy was defined by this Court in Skutt v Grand Rapids[4] and Sipes v McGhee, 316 Mich 614, 623-624; 25 NW2d 638 (1947):[5]
“ ‘What is the meaning of “public policy?” A correct definition, at once concise and comprehensive, of the words “public policy,” has not yet been formulated by our courts. Indeed, the term is as difficult to define with accuracy as the word “fraud” or the term “public welfare.” In substance, it may be said to be the community common sense and common conscience, extended and applied throughout the State to matters of public morals, public health, public safety, public welfare, and the like. It is that general and well-settled public opinion relating to man’s plain, palpable duty to his fellow men, having due regard to all the circumstances of each particular relation and situation.
“ ‘Sometimes such public policy is declared by Constitution; sometimes by statute; sometimes by judicial decision. *89 More often, however, it abides only in the customs and conventions of the people, — in their clear consciousness and conviction of what is naturally and inherently just and right between man and man. It regards the primary principles of equity and justice and is sometimes expressed under the title of social and industrial justice, as it is conceived by our body politic. When a course of conduct is cruel or shocking to the average man’s conception of justice, such course of conduct must be held to be obviously contrary to public policy, though such policy has never been so written in the bond, whether it be Constitution, statute or decree of court. It has frequently been said that such public policy is a composite of constitutional provisions, statutes and judicial decisions, and some courts have gone so far as to hold that it is limited to these. The obvious fallacy of such a conclusion is quite apparent from the most superficial examination. When a contract is contrary to some provision of the Constitution, we say it is prohibited by the Constitution, not by public policy. When a contract is contrary to statute, we say it is prohibited by a statute, not by public policy. When a contract is contrary to a settled line of judicial decisions, we say it is prohibited by the law of the land, but we do not say it is contrary to public policy. Public policy is the cornerstone — the foundation — of all constitutions, statutes, and judicial decisions, and its latitude and longitude, its height and its depth, greater than any or all of them. If this be not true, whence came the first judicial decision on matter of public policy? There was no precedent for it, else it would not have been the first.’ ” [Skutt, supra at 264, quoting Pittsburgh, C, C & St L Ry Co v Kinney, 95 Ohio St 64; 115 NE 505 (1916).]
Public policy is what is just, right, reasonable, and equitable for society as a whole. McNeal, Judicially determined public policy: Is “the unruly horse” loose in Michigan?, 13 TM Cooley L R 143, 149 (1996).
Contrary to the majority’s conclusion, the public policy of this state supports family day-care homes. This fact is evidenced by the actions over time of various state entities. The Legislature has defined *90 family day-care homes as residential uses in zoning statutes. See MCL 125.216g and 125.286g.[6] It has seen fit to regulate family day-care homes in the context of the child care licensing act for the protection of children. See MCL 722.111 et seq.[7]
The executive branch has addressed the issue of child care. Michigan Executive Order No. 1995-21 established an advisory committee on day care for children. The committee later issued recommendations intended to strengthen the child care system of this state. See DSS Child Care: Making It Work, Pub No. 714 (February, 1996).
Finally, the judiciary in case law has proclaimed that Michigan public policy favors family day-care homes. For example, in Beverly Island, supra at 330-331, the Court of Appeals articulated that policy.
In light of these express indications, it follows that restrictive covenants prohibiting family day-care homes are contrary to our state’s public policy and are unenforceable.[8] The majority’s dismissal of these strong indications of public policy is baffling and disturbing. Its narrow approach to determining public policy constrains the judiciary by prohibiting it from invalidating covenants absent express statutory mandates.
*91 But judicial decisions are an important component of public policy because they fill gaps occurring in constitutions and statutes. Constitutions, which are necessarily broad in scope, are not intended to resolve every controversy that might arise. Statutes are narrower in scope, providing rules governing society. But it is clear that the Legislature cannot foresee every situation likely to result in controversy. McNeal, supra at 143-144.
When controversy arises, it is the role of the judiciary to determine the law as it applies to the facts of the particular case. This sometimes requires the judiciary to make public policy determinations. Thus, if the courts are to decide issues presented in novel factual situations not contemplated by statute, they must necessarily have the power to determine existing public policy. Id, at 146.
As early as 1888, this Court acknowledged the significance of public policy. See McNamara v Gargett, 68 Mich 454; 36 NW 218 (1888). McNamara adopted a definition of public policy that considered the morals of the time and the established interest of society. Id. at 460. It held that a promissory note was not enforceable, reasoning that the interests of the individual must be subservient to public welfare. Id. at 461-462. Public policy was also considered by this Court in decisions as old as Fetters v Wittmer Oil & Gas Properties,[9] Brown v Union Banking Co,[10] and Sellars v Lamb.[11]
Hence, the majority’s refusal to weigh, as is appropriate here, public policy not codified in the law of *92 the state is sharply contrary to this Court’s long established practice. The majority fails to provide a persuasive reason for so doing. Instead, it engrafts its own version of what the law should be, discarding the knowledge and wisdom of those who came before the current Court. This is the embodiment of judge-made law.
in. CONCLUSION
The majority’s reasoning contravenes established principles of law. It unreasonably characterizes land use employing only one criterion, whether monetary compensation is involved, without any consideration of the restrictions as a whole or the effect of the use on the community. This creates an unworkable standard with far-reaching negative implications regarding the free use of land.
Additionally, the majority turns its back on public policy that was developed and has been applied by this Court for decades. This too has extensive adverse implications for the jurisprudence of the state.
The operation of family day-care homes is residential in nature and does not violate restrictive covenants prohibiting commercial or business use. Additionally, restrictive covenants barring their operation are contrary to public policy and, therefore, are unenforceable. I would affirm the Court of Appeals decision.
Cavanagh, J., concurred with Kelly, J.

 361 Mich 44; 104 NW2d 772 (1960).

 The restrictive covenants are:
1. No part of any of the premises above described may or shall be used for other than private residential purposes.
3. No lot shall be used except for residential purposes.
12. No noxious or offensive activity shall be carried on upon any lot, nor shall anything be done thereon which may be or may become an annoyance or nuisance to the neighborhood.
14. No part or parcel of the above described premises shall be used for any commercial, industrial, or business enterprises nor the storing of any equipment used in any commercial or industrial enterprise.
23. If the parties hereto, or any of them, or their heirs, assigns, or successors, as the case may be, shall violate or attempt to violate any of the covenants herein, it shall be lawful for any other person or persons owning any real property situated within the bounds of the above described premises to prosecute any proceedings at law or in equity against the person or persons violating or attempting to violate any such covenant, and either to prevent him or them from doing so, or to recover damages arising or resulting from such violation.

 In Boston-Edison Protective Ass’n, this Court refused to interpret the terms “single dwelling house” as requiring use limited to those who are members of a single family.

 275 Mich 258, 264-265; 266 NW 344 (1936).

 Rev’d on other grounds in Shelley v Kraemer, 334 US 1; 68 S Ct 836; 92 L Ed 1161 (1948).

 Earlier cases examined zoning statutes in determining public policy. See Craig, supra; McMillan v Iserman, 120 Mich App 785; 327 NW2d 559 (1982). We know of no reason to discard this approach.

 This reliance is supported by reasoning in Craig, supra. That case relied in part on the Adult Foster Care Facility Licensing Act in determining public policy.

 We acknowledge that Wood supports property owners’ contractual rights to enforce restrictive covenants. However, such restrictions cannot be enforced when they violate sound public policy. Livonia, supra at 525; Oosterhouse, supra at 286. Thus, the contractual rights of property owners cannot contravene public policy.

 258 Mich 310; 242 NW 301 (1932).

 274 Mich 499; 265 NW 447 (1936).

 303 Mich 604; 6 NW2d 911 (1942).