# STATE OF MICHIGAN

# COURT OF APPEALS

WILLIAM DEGHETTO, DEBRA DEGHETTO, LORI WOODS, RICHARD NELSON, CONNIE HILL, JOHN HILL, JANICE SMITH, LLOYD SMITH, PATTE DAY, DONALD DAY, MARGARET RIEPEN, KENNETH RIEPEN, RICK WOODWORTH, SHIRLEY MATUSZEWSKI, JEANNE KOZIOL, WALTER KOZIOL, JUNE MULLINIX, GREGORY MULLINIX, KENDRA PAPPAS, VERN PAPPAS, EDWARD MICHALSKI, EDWARD BALDWIN, SUSAN C. VERNIER, LON M. VERNIER, JUDITH JOHNS, JOHN JOHNS, CELESTINE KESSLER, NEIL KESSLER, KATHRYN WOLFF, PAUL WOLFF, CHERYL JONES, ROBERT JONES, MARCIA CARLINE, THOMAS CARLINE, and PRICE SPOOR,

UNPUBLISHED
June 22, 2017

Plaintiffs-Appellees,

v

No. 330972
Oakland Circuit Court
LC No. 2014-141355-CH

BEAUMONT'S SEVEN HARBORS WHITE AND DUCK LAKE ASSOCIATION,

Defendant-Appellant.

Before: JANSEN, P.J., and MURPHY and BORRELLO, JJ.

PER CURIAM.

In this case regarding the ongoing viability of restrictive covenants on plaintiffs' lots, defendant homeowners' association appeals a November 23, 2015, trial court order denying its motion for summary disposition and granting summary disposition in favor of plaintiffs pursuant to MCR 2.116(C)(10). For the reasons set forth in this opinion, we affirm.

## I. FACTS

The facts in this case are at times somewhat muddled, though they are not disputed. Plaintiffs own (or owned) lots in six separate subdivisions in Highland Township, Michigan,

-1-

which are collectively known as Seven Harbors Subdivisions. Defendant is the homeowners' association for the entire development, which contains over 650 lots. Defendant wishes to enforce certain covenants, which plaintiffs assert have expired.

The land now known as Seven Harbors belonged to various members of the Beaumont family until Harry S. and Florence M. Beaumont (the "Beaumonts") began subdividing the land in the 1930s. The first two subdivisions created from the land are known as Supervisor's Plat No. 1 ("SP1") and Supervisor's Plat of Seven Harbors ("SPOSH"). When defendant was incorporated in November 1947, it included only these two subdivisions. The Articles of Incorporation were amended in 1959 to add three additional subdivisions, Supervisor's Plat No. 5 ("SP5"), Supervisor's Plat No. 6 ("SP6"), and Proprietor's Plat of Seven Harbors Reserve ("PPOSHR"). The sixth and final subdivision is Supervisor's Plat 7 (hereafter "SP7"). It is not clear from the record when SP7 was created, but it appears to have been replatted from land that had been a private park sometime before 1962.

The lots of the two original subdivisions, SP1 and SPOSH, were originally transferred from the Beaumonts to various purchasers by a form deed. Plaintiffs provided an example of one such deed by which, in 1935, the Beaumonts sold a lot to George and Sarah Miles (the "1935 Miles Deed"). In this form deed, the Beaumonts agreed to convey certain land, along with a maintenance fund, to a homeowners' association that was to be created. The association was to own and maintain that land, which would be used to provide purchasers with access to the lake for boating and swimming. The form deed also provided that each purchaser would automatically become a member of the association, and the purchasers agreed for themselves, their "heirs, executors and assigns" to pay an annual maintenance fee, not to exceed $5 per year. There was a provision authorizing the association to place a lien on the property if the dues were not paid. This original form deed also included extensive restrictions regarding building lines, the character and value of the buildings, docks and buoys, fences, front yards, garbage and refuse, and swimming. It stated explicitly that the restrictions would run with the land and that they would expire on January 1, 1960.

That document was allowed to expire. Effective on the expiration date, however, the homeowners of SP1 and SPOSH adopted deed restrictions, which the parties refer to as the "1959 Deed Restrictions." These restrictions were recorded. The 1959 Deed Restrictions contained the substance of the original building restrictions found in the 1935 Miles Deed, and included a provision that each purchaser would automatically become a member in the association. There was no language in the 1959 Deed Restrictions stating that any covenants ran with the land, nor any specific mention of maintenance fees. The 1959 Deed Restrictions provided that they would expire on January 1, 1986, unless properly extended.

The Beaumonts apparently sold the lots in the next three subdivisions, SP5, SP6, and PPOSHR, in the late 1950s and early 1960s, and used an entirely different form of conveyance document. Plaintiffs provided examples of six such documents. The grantors in all of these documents were the Beaumonts, but in other respects these documents differed substantially from the 1935 Miles Deed. For example, none of these documents contains a recitation of the restrictions that appear in the 1935 Miles Deed. Each of the six documents does, however, contain language by which the original purchasers of these lots agreed that they were members of the association and agreed to pay to the association a yearly fee to be capped at $15 per year.

The conveyance documents do not, however, expressly state that the grantees made this agreement for their heirs, successors or assigns or that the covenants would run with the land. That provision, in three of these deeds, is as follows:[1]

> The Grantees hereby agree that they, as property owners in Seven Harbors, are now and so long as they remain as such, members of the 'BEAUMONT'S SEVEN HARBORS WHITE AND DUCK LAKE ASSOCIATION' and are subject herewith to it's [sic] restrictions and by-laws. They hereby agree to pay, yearly, to this Association, a maintenance fee of 1% of the assessed valuation for tax purposes, of his conveyed property, not to exceed $15.00 per year per unit, so long as said rate of 1% per annum shall remain in effect, which shall be used, together with money collected from other owners for the upkeep of Seven Harbors. It is further agreed that the Grantees will not sell or otherwise dispose of this conveyed property to any person or persons not accepted by this Association.

Presumably because these later owners were not bound by the restrictions found in the 1935 Miles Deed concerning building lines, the character and value of the buildings, docks and buoys, fences, front yards, garbage and refuse, and bathing, the association adopted substantially similar deed restrictions for these three subdivisions in 1956. This document, to which the parties refer as the "1956 Deed Restrictions," is nearly identical with the 1959 Deed Restrictions discussed above, which were applied to the first two subdivisions three years later. Specifically, like the 1959 Deed Restrictions, the 1956 Deed Restrictions contained a clear statement that every purchaser would become a member of the association by virtue of the purchase and provided that they would expire on January 1, 1986, unless properly extended. Like the 1959 Deed Restrictions, the 1956 Deed Restrictions do not mention maintenance fees. No such document was ever adopted for SP7.

Both the 1956 Deed Restrictions and the 1959 Deed Restrictions provided that they could not be extended without the written consent of 75% of the membership:

> The Association shall have the right to alter, amend and abolish any of the foregoing restriction, [sic] or to add to or extend the time of such restrictions at any time, provided that it shall first notify all members of such proposed action and obtain the written consent of at least 75% of the membership, to such action.

No subsequent document adopted by the Seven Harbors residents contained language purporting to extend the 1956 or 1959 Deed Restrictions.

---

[1] The other deeds the others are substantially similar.

By the time the underlying lawsuit was filed, the maintenance fees charged to each lot had increased to between $185 and $225 per lot. Defendant used these fees, not only for the maintenance of the land it acquired from the Beaumonts for the residents to use for access, but also for such things as boat docks and an annual community bicycle parade. The trial court noted that plaintiffs believed that the decisions made by defendant's board of directors regarding expenditures did not benefit the owners of all lots equally.

The events that led to this lawsuit began to unfold in 2008, when defendant recorded a lien against a lot in SP1 for nonpayment of the maintenance fee. In 2010, the owner of that lot wrote to defendant's attorneys requesting that the lien be removed because the deed restrictions had expired and not been renewed. In 2012, defendant retained an attorney to opine on whether membership (and maintenance fees) were still mandatory for all owners, and he informed those who attended a general membership meeting that all deed restrictions had expired on January 1, 1986, and had not been renewed. In its August 2012 newsletter to all owners, defendant restated that conclusion and added, "this means that membership in the Association is no longer mandatory."

In December 2012, defendant's newly-elected board president called a special meeting of the executive board, at which he announced his opinion that only the actual building restrictions had expired, not the obligation to pay membership fees. The executive board authorized the retention of another attorney to provide a second opinion on this matter. This attorney opined, based largely on a document he called the "1937 Master Deed," that all parcel-owners were members of the association and were subject to the payment of the fees.[2] Defendant then notified the homeowners that the restrictions were perpetual, membership in the association was mandatory, and the association had the power to place liens on properties when owners failed to pay the maintenance fees.

Plaintiffs filed this case on June 13, 2014, bringing claims entitled Declaratory Relief, Shareholder Oppression, and Slander of Title. Defendant removed the liens it had placed, and the claims for shareholder oppression and slander of title were dismissed. Ultimately, the parties filed cross-motions for summary disposition as to the claim for declaratory relief. Following a motion hearing, the trial court issued an order denying summary disposition to defendant and granting summary disposition to plaintiffs. This appeal followed.

## II. STANDARD OF REVIEW

This Court reviews a grant or denial of a motion for summary disposition de novo. *Bloomfield Estates Improvement Ass'n, Inc v City of Birmingham*, 479 Mich 206, 211-212; 737 NW2d 670 (2007). "In reviewing a motion for summary disposition brought under MCR 2.116(C)(10), we consider the affidavits, pleadings, depositions, admissions, or any other documentary evidence submitted in [the] light most favorable to the nonmoving party to decide whether a genuine issue of material fact exists." *City of Huntington Woods v City of Detroit*, 279

---

[2] As the trial court noted, however, this document was never produced, plaintiffs had never seen it, and defendant's president testified that he had no knowledge of a 1937 Master Deed.

Mich App 603, 614; 761 NW2d 127 (2008) (quotation marks omitted). A motion brought pursuant to MCR 2.116(C)(10) is properly granted only if there is no genuine issue of material fact and "the moving party is entitled to judgment as a matter of law." *Huntington Woods*, 279 Mich App at 614 (quotation marks omitted).

"When reviewing a grant of equitable relief, an appellate court will set aside a trial court's factual findings only if they are clearly erroneous, but whether equitable relief is proper under those facts is a question of law that an appellate court reviews de novo." *McDonald v Farm Bureau Ins Co*, 480 Mich 191, 197; 747 NW2d 811 (2008). "This Court also reviews de novo the proper construction of restrictive covenants involving real property." *Conlin v Upton*, 313 Mich App 243, 254; 881 NW2d 511 (2015).

## III. ANALYSIS

### A. EXTENSION OF 1956 DEED RESTRICTIONS

Defendant first argues that the 1956 and 1959 Deed Restrictions were extended past their stated expiration date of January 1, 1986, because the 1959 Amendments to the Articles of Incorporation constituted a valid action under the laws of Michigan and it was approved by 75% of the membership as required by the deed restriction document.

"A deed restriction represents a contract between the buyer and the seller of property." *Bloomfield Estates*, 479 Mich at 212. As such, if a deed restriction is not ambiguous, it is "not open to judicial construction and must be *enforced as written*." *Id*. "Moreover, the language employed in stating the restriction is to be taken in its ordinary and generally understood or popular sense, and is not to be subjected to technical refinement, nor the words torn from their association and their separate meanings sought in a lexicon." *Brown v Martin*, 288 Mich App 727, 731; 794 NW2d 857 (2010) (quotation marks omitted).

The deed restrictions of both 1956 and 1959 were to expire on January 1, 1986, "[i]f these restrictions are not extended by valid action under the law of this state and the provisions herein . . . ." The provisions of each document included a requirement that they could not be extended without the written consent of 75-percent of the membership:

> The Association shall have the right to alter, amend and abolish any of the foregoing restriction[s], or to add to or *extend the time of such restrictions* at any time, provided that it shall first notify all members of such proposed action and *obtain the written consent of at least 75% of the membership*, to such action. [(Emphasis added.)]

The 1959 Amendment to the Articles of Incorporation added the three newer subdivisions (SP5, SP6, and PPOSHR) to the original two (SPOSH and SP1) that were included in the 1947 Articles of Incorporation. The 1959 Amendment stated that the maintenance fee was 1-percent of assessed valuation, as set in the 1947 Articles of Incorporation, but added a minimum of $2 and lowered the cap on the maintenance fee from $20 to $15. It further provided that the fee could be raised as needed "by vote of a majority of the property owners." Finally, the 1959 Amendment to the Articles of Incorporation states that it was approved by "75% of each class entitled to vote and 75% of each class whose rights, privileges or preferences are changed."

The 1959 Amendment, however, contains no language that purports to extend any deed restrictions. Defendant does not dispute this; rather, defendant argues only that the adoption of the 1959 Amendment extended the 1956 Deed Restrictions because it was a "valid action taken under the laws of Michigan," it made membership mandatory, and it was approved by 75-percent of the owners. Even if this statement were true in all respects, it is axiomatic that no contract can be binding regarding a topic it does not address. Contracts must be enforced as written; we cannot read language into a contract that is not there. See *Bloomfield Estates*, 479 Mich at 212. Defendant's argument fails on this basis alone.

Additionally, the 1959 Amendment to the Articles of Incorporation does not make membership mandatory; it only incorporates membership language from the 1947 constitution. That constitution merely stated that the association was formed by property owners and membership is restricted to property owners. This language simply does not require all owners to become members. The first statement could reasonably be interpreted as meaning that the association consists of either some of the property owners or all of them. The second statement clearly states that no one can be a member who is not a property owner in Seven Harbors, but it does not state the converse—that all property owners must be members.

Also, there is no evidence that 75-percent of the owners consented to the adoption of the 1959 Amendment in writing, as the 1956 Deed Restrictions required. The 1959 Amendment to the Articles of Incorporation stated that it was approved by "75% of each class entitled to vote and 75% of each class whose rights, privileges or preferences are changed." Defendant seems to argue that this language is *itself* the written consent that was contemplated in the 1956 Deed Restrictions. Even if the reference to the number of people who voted meant that 75-percent of *all* owners did so, the document does not state that those voters gave their written consent. Nor was defendant able to present any other evidence showing that 75-percent of the membership agreed to the 1959 Amendment in writing.

Defendant also argues that the 1956 Deed Restrictions were extended before they expired on January 1, 1986, contending that the trial court erred by not considering the "Ziegler Affidavit" as proof of the alleged extension. However, the document is not a valid affidavit in that it was not properly sworn; moreover, the document does not state that 75-percent of the members voted in writing to extend the deed restrictions. Therefore, the trial court did not err by not considering the Ziegler statement.

Finally, defendant argues that plaintiffs Woods and Nelson, who lived in SP7, were subject to a mandatory membership requirement because the expired 1956 and 1959 Deed Restrictions never applied to them, but they were subject to the Association's bylaws, articles of incorporation, and constitution, all of which require membership. Defendant cites no evidence which could lead this Court to find that these plaintiffs ever actually or constructively agreed to be bound by any of the Association's documents.

In sum, the trial court did not err when it held that the 1956 and 1959 Deed Restrictions expired on January 1, 1986, and were not extended.

## B. SIX SPECIFIC DEEDS

Defendant next argues that each original grantee of six specific properties agreed to be paying members of the Association, and that this obligation runs with the land under Michigan law, binding 12 of the plaintiffs (the Koziols, Mullinixes, Verniers, Wolffs, Pappases, and Days) to membership and an obligation to pay maintenance fees.

Restrictive covenants are contracts that are created in order to enhance the value of the subject property, and are, therefore, valuable property rights. *Conlin*, 313 Mich App at 256. Agreements concerning the use of real property, therefore, are subject to both contract and property law. "[C]ourts must normally enforce unwaived restrictions on which the owners of other similarly burdened property have relied." *O'Connor v Resort Custom Builders,* Inc, 459 Mich 335, 343; 591 NW2d 216 (1999). However, a restriction "must be expressly provided in the controlling documents." *Conlin*, 313 Mich App at 256. Moreover, "[c]ourts will not enlarge or extend a restriction through interpretation, even to accomplish what it may be thought the parties would have desired." *Id.* at 256-257.

A covenant can be personal to the original parties to the agreement, or it can run with the land. *Mueller v Bankers' Trust Co of Muskegon*, 262 Mich 53, 56; 247 NW 103 (1933). If a covenant runs with the land, any subsequent purchaser will also be bound if that purchaser has actual or constructive notice of the covenant, as when the covenant appears in the chain of title. *Conlin*, 313 Mich App at 260.

In this case, there is no express language in any of the six deeds at issue here to indicate that the grantors intended the covenant to run with the land. Strict construction requires that a restriction "must be expressly provided in the controlling documents." *Conlin*, 313 Mich App at 256. It is not clear from the language in the deeds at issue here that the Beaumonts intended the membership and fees obligation in these conveyances to run with the land. "Courts will not enlarge or extend a restriction through interpretation, even to accomplish what it may be thought the parties would have desired . . . ." *Id.* at 256-257. Therefore, the 12 plaintiffs at issue here were not bound by the covenants in the original deed.

## C. RECIPROCAL NEGATIVE EASEMENT

Defendant argues that, pursuant to the doctrine of reciprocal negative easements, this Court should enforce the covenants regarding the membership and maintenance fee requirements against all lots in the Seven Harbors Subdivisions, despite the lack of recorded restrictions against some lots, because the subdivisions were developed according to a common theme. This argument lacks merit.

Generally, restrictions of the use of property must be in the conveyance upon which the title to that property rests. *Denhardt v De Roo*, 295 Mich 223, 228; 294 NW 163 (1940). "Where there is no express restriction in the chain of title of the particular lot the use of which is sought to be restricted, there must be proof of a 'scheme of restrictions' originating from a common owner." *Id.* (citation omitted). The scheme must arise from a common grantor and the scheme cannot be created by other lot owners conforming to a general plan. *Id*. at 229. A reciprocal negative easement exists when such a "scheme of restrictions" is applied to property whose chain of title includes no such restrictions. See *Lanski v Montealegre*, 361 Mich 44, 47; 104 NW2d 772 (1960) (emphasis in original). To find a reciprocal negative easement,

[t]here must have been a common owner of the related parcels of land, and in his various grants of the lots he must have included some restriction, either affirmative or negative, for the benefit of the land retained, evidencing a scheme or intent that the entire tract should be similarly treated. Once the plan is effectively put into operation, the burden he has placed upon the land conveyed is by operation of law reciprocally placed upon the land retained. In this way those who have purchased in reliance upon this particular restriction will be assured that the plan will be *completely* achieved. [*Lanski*, 361 Mich at 47.]

In this case, it is undisputed that there was a common grantor, the Beaumonts; there were plat maps for all subdivisions, although they were unrecorded; and there were nearly identical restrictions in the original form deeds as well as similar restrictions in at least six of the deeds entered into in the 1950s. However, the restrictions expired as to SP1, SPOSH, SP5, SP6, and PPOSHR on January 1, 1986, and never applied to SP7. Our Supreme Court has explained that "[a reciprocal negative easement] runs with the land sold by virtue of express fastening and *abides with the land retained until loosened by expiration of its period of service* or by events working its destruction." *Sanborn*, 233 Mich at 230 (emphasis added). Here, the restrictions expired and were never renewed; therefore, none of the six subdivisions are now subject to the covenant to be fees-paying members of the association after that time. The trial court did not err in holding that the doctrine of reciprocal negative easements does not apply in this case.

## D. LACHES

Finally, defendant argues that the doctrine of laches should apply to bar plaintiff's suit because there was a change in conditions that made granting relief to plaintiffs inequitable— plaintiffs' sudden refusal to pay dues, which prejudiced defendant because it had relied on their payments for years. This argument also lacks merit.

The equitable doctrine of laches bars a claim "when the passage of time combined with a change in condition [] would make it inequitable to enforce the claim against the defendant." *Township of Yankee Springs v Fox*, 264 Mich App 604, 612; 692 NW2d 728 (2004). "It is applicable in cases in which there is an unexcused or unexplained delay in commencing an action and a corresponding change of material condition that results in prejudice to a party." *Public Health Dep't v Rivergate Manor*, 452 Mich 495, 507; 550 NW2d 515 (1996). "Laches differs from the statutes of limitation in that ordinarily it is not measured by the mere passage of time. Instead . . . we must afford attention to prejudice occasioned by the delay." *Lothian v City of Detroit*, 414 Mich 160, 168; 324 NW2d 9 (1982) (internal citations omitted).

In this case, plaintiffs did not delay in filing suit. There was debate over whether the dues were enforceable and two attorneys rendered different opinions on the matter. Plaintiffs asserted their right by filing suit after defendant indicated that the dues were mandatory as opposed to voluntary. Furthermore, defendant cannot show prejudice. Defendant argued that it was prejudiced because plaintiffs suddenly stopped paying their dues, on which it had relied for years. However, this effect was not occasioned by the plaintiffs' *delay* in filing this case; plaintiffs would have stopped paying their dues whenever they asserted this action. In short, the trial court did not err in holding that the doctrine of laches did not bar plaintiffs' suit.

## IV. CONCLUSION

The trial court did not err in denying defendant's motion for summary disposition and in granting plaintiff's motion for summary disposition pursuant to MCR 2.116(C)(10).

Affirmed. Plaintiffs, having prevailed, may tax costs. MCR 7.219(A).

/s/ Kathleen Jansen
/s/ William B. Murphy
/s/ Stephen L. Borrello